UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 3:14CR208-MOC |
| v. | ) | |
| | ) | **GOVERNMENT'S TRIAL BRIEF** |
| PAUL BURKS | ) | |
| _____ | ) | |

NOW COMES the United States of America, by and through Jill Westmoreland Rose, United States Attorney for the Western District of North Carolina, and hereby submits this Trial Brief to aid the Court in presiding over the upcoming trial of *United States v. Paul Burks.*

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF ANTICIPATED FACTS ............................................... 1

        A.      Making Up the Number to Get Victims' Money ........................................ 1

        B.      Recruiting Bogus Investments ................................................................ 2

        C.      Disguising the Scheme ............................................................................ 3

        D.      The Calls and Red Carpet Events ........................................................... 4

        E.      The Lulling ............................................................................................. 5

        F.      The Crumbling of the Scheme ................................................................ 5

        G.      The Tax Fraud (Klein) Conspiracy ......................................................... 6

III.    COUNT ONE:  CONSPIRACY ................................................................. 7

        A.      Agreement ............................................................................................... 7

        B.      Knowing Participation ............................................................................ 9

        C.      Evidence of Motive ................................................................................ 11

        D.      Defendant on Notice of Fraudulent Nature of Scheme ........................... 12

        E.      Overt Act ................................................................................................ 13

IV.     COUNT TWO: MAIL FRAUD ................................................................. 13

        A.      Knowing Participation in Scheme to Defraud ......................................... 14

        B.      Use of Mails to Execute Scheme ........................................................... 14

V.      COUNT THREE: WIRE FRAUD ............................................................. 15

        A.      Scheme to Defraud ................................................................................ 16

        B.      Use of Wire Communication ................................................................. 16

VI.     COUNT FOUR: TAX FRAUD CONSPIRACY ..................................... 16

        A.      Agreement .............................................................................................. 17

Case 3:14-cr-00208-MOC-DSC   Document 83   Filed 06/24/16   Page 2 of 49

B.      Overt Act ................................................................... 17

C.      Intent to Agree and to Defraud the United States ...................................... 18

VII.       EVIDENTIARY ISSUES ........................................................ 18

A.      Hearsay and Confrontation Issues ............................................. 18

     1.      Non-Hearsay:  Defendant and Defendant's Agent Admissions ... 18

     2.      Inadmissible Hearsay: Defendant's Own Out-of-Court Statements ....................................................................... 19

B.      Lay Witness Issues ....................................................... 20

     1.      Defendant Lay Witness Testimony as to Defendant's Mental State ....................................................................... 20

     2.      Victim Testimony ................................................. 21

     3.      Lay Testimony by Those With Specialized Knowledge.............. 22

C.      Other Witness Issues ..................................................... 24

     1.      Defendant Character Witnesses: Cross-Examination ................. 24

     2.      Summary Witnesses ............................................... 25

     3.      Expert Witnesses ................................................. 25

     4.      Impeachment with Reports of Interview....................................... 27

D.      Evidence Against One Co-Conspirator Admissible Against All .............. 28

E.      Documentary Evidence .................................................... 29

     1.      Certified Copies .................................................. 29

     2.      Business Records ................................................. 30

     3.      Charts and Summaries ............................................. 30

F.      Jury Nullification and Other Prohibited Arguments and Evidence ......... 32

     1.      Blame the Victim's Negligence .................................... 32

     2.      Alleged Wrongdoing of Others..................................... 33

3.  Government's Failure to Prosecute Certain Witnesses ................. 35

4.  Specific Instances of Good or Lawful Conduct ........................... 36

5.  Impact of Conviction on Defendant's Family ............................. 38

6.  Penalties Faced by Defendant ........................................................ 38

7.  Vouching/Defense Attorneys as Witnesses ................................. 39

8.  Civil Settlements by Witnesses ..................................................... 39

G.  Sequestration ........................................................................................... 40

VIII.   FORFEITURE ...................................................................................................... 40

A.  Statutory Bases for Forfeiture .................................................................. 40

B.  Forfeiture Procedure ................................................................................. 41

IX.   CONCLUSION .................................................................................................... 44

Respectfully submitted this the 24th day of June, 2016 by: ................................................ 44

JILL WESTMORELAND ROSE ........................................................................................... 44

UNITED STATES ATTORNEY .......................................................................................... 44

iv

# I.     INTRODUCTION

On October 24, 2014, a federal grand jury returned a four count Bill of Indictment ("the indictment") charging Paul Burks with mail and wire fraud conspiracy, one substantive count of each of mail fraud and wire fraud, and tax fraud conspiracy. Two of Burks' co-conspirators have entered into plea agreements in connection with their role in the scheme: Dawn Wright Olivares (3:13cr335), and Daniel Olivares (3:13cr335). Burks entered a plea of not guilty.

Trial is currently scheduled to begin July 5, 2016. The Government anticipates at this time that its case-in-chief will take approximately one to two weeks.

# II.     STATEMENT OF ANTICIPATED FACTS

The United States expects to prove the following facts at trial:

## A.     Making Up the Number to Get Victims' Money

Defendant Burks and co-conspirators Dawn Wright Olivares, Daniel C. Olivares, D.D., R.P., and others represented that, through ZeekRewards, victim-investors, referred to as "Affiliates," could participate in what came to be known as the Retail Profit Pool or RPP ("Zeek's profits") which supposedly allowed victims collectively to share up to 50% of Zeek's daily net profits.

The co-conspirators falsely represented that Zeek was generating massive retail profits. Indeed, the co-conspirators claimed that they calculated and shared with investors the "daily net profit," which supposedly represented half of each day's net retail profit.

In truth and fact, the "daily net profit" was not half the net retail profit of Zeekler and had no relationship to actual penny auction revenues or profits. Moreover, the co-conspirators did not keep books and records needed to calculate such a figure.

1

Defendant Burks simply made up the "daily net profit" without any reference at all to profits. The true revenue from the scheme, approximately 98% of all incoming funds, came from victim-investors. Victim-investors, including numerous victim-investors in the Western District of North Carolina, sent money to ZeekRewards via the United States Postal Service as well as other commercial interstate carriers, via interstate wire communications, and by delivering checks to Zeek's office in North Carolina. Each victim-investor, including numerous victim-investors in the Western District of North Carolina, used the internet to access his or her "Back Office" on the ZeekRewards website. The Back Office, among other things, enabled each victim-investor to track his or her bid or point balance or supposed share of Zeek's profits.

**B.    Recruiting Bogus Investments**

Victims invested in Zeek through the purchase of "VIP Bids" in increments of no greater than 10,000. Each VIP Bid was sold for $1. Initially, the victim-investors were promised that they would receive a return on investment of 125% on each VIP Bid purchased. Thus the VIP Bids were represented as functioning like shares of Zeekler stock. Each share entitled the victim-investor to a pro rata share of up to 50% of the supposed net profits of Zeek.

By rigging the "daily net profit" figure, the co-conspirators ensured that the shares returned or even exceeded the promised 125% return on investment. In order to participate, victim-investors were also required to pay a monthly subscription fee and to place a daily ad to purportedly attract new participants to the penny auctions. The co-conspirators wrote the ads themselves and directed the victim-investors on where to post them, and implemented an automated program so that top affiliates did not even have to place ads, so that investors could easily meet the daily ad requirement. The co-conspirators did not track whether the ads actually increased traffic, or bidding, on Zeekler.

2

During the relevant time period, the co-conspirators fraudulently obtained over $800 million from victims for VIP Bid purchases as well as over $96 million from subscription fees. The co-conspirators used this money, in Ponzi-like fashion, to pay other victim-investors in the scheme and to personally enrich themselves. In order to further the Ponzi scheme, Defendant PAUL Burks and others took numerous steps, including encouraging victim-investors not to withdraw their purported earnings and encouraging victim-investors to recruit new participants through commissions.

### C.    Disguising the Scheme

As the Ponzi scheme grew in size and scope, the co-conspirators took several steps to conceal its true nature and to prevent scrutiny by regulators by making a series of cosmetic changes. For example, the co-conspirators initially called the Retail Profit Pool the "compounder" and touted it as way to obtain a 125% "rebate" or "return on investment" on the purchase of "compounding bids." Over time, the co-conspirators attempted to eliminate references to the terms "compounder," "compounding bids," and 125% "return on investment," to conceal the true nature of the Ponzi scheme and to prevent scrutiny by regulators.

At some point, instead of specifically promising a 125% return of investment on each dollar invested through the purchase of a VIP Bid, the co-conspirators published bogus daily figures of Zeek's profits, averaging approximately 1.4% a day, to reach the 125% goal.[1] The supposed daily Zeek's profits figure was not based on any actual computation of daily profit. Indeed Zeek lacked the books and records that would be necessary to compute such a number.

Instead, Defendant Burks made up the RPP to artificially reach the originally advertised

---

[1] $125 \div 90 = 1.39$

125% return of investment. These bogus daily net profit figures were generally provided by Defendant Burks to Daniel Olivares to be manually entered into the Zeek computer system and were always approximately 2% for Monday through Thursday and approximately 1% for Friday through Sunday. For example, on July 27, 2012, Defendant PAUL Burks asked Daniel C. Olivares, "Did you already guess an RPP percentage? If not, use .0191." Daniel C. Olivares responded to Defendant PAUL Burks, "I did, I used…0.0191." For example, on August 9, 2012, Defendant PAUL Burks texted Daniel C. Olivares, "…Please use the previous week for RPP until I tell you otherwise except, of course, for reversing thur and fri last week." The purported net daily profit was designed to, among other things, continue to generate a bogus 125% return on investment for each dollar invested through the purchase of a VIP Bid.

Additionally, the co-conspirators later conditioned the receipt of payments for some investors on giving away VIP Bids. However, just as with the ad requirement, the co-conspirators designed and implemented various automated programs so that investors could instantly give such bids away upon the purchase of a VIP Bid by merely pressing a button on the website. Additionally, just as with the ads, the co-conspirators did not do any research to determine whether or not the bids supposedly given away by victim-investors provided any discernable value, such as increased traffic, or bidding, on Zeekler. In fact, the vast majority of these "given-away" bids were never used.

### D. The Calls and Red Carpet Events

Co-conspirators hosted weekly conference calls and leadership calls where participants from across the world dialed in to hear details of the scheme from Defendant Burks and others who made false representations about the profit and income of Zeek and encouraged victim-investors to invest money and to recruit others to do so based on the easy income opportunity.

Defendant Burks and others also organized and attended "Red Carpet Events" where victim-investors came to hear details of the scheme in person. During Red Carpet Events and at other times the co-conspirators falsely represented that Zeekler's penny auction site was generating massive retail profits.

Defendant Burks and others also utilized electronic and print media, including websites, emails, and journals, to make false and misleading statements about the success of Zeekler to recruit victim-investors.

### E.    The Lulling

The co-conspirators attempted to lull victim-investors and to bolster the credibility of Zeek by hiring attorneys, and touting their advice and approval of the legality and legitimacy of Zeek to victim-investors and others, including banks, in emails, letters, and conference calls. In reality, these attorneys could not have reviewed the actual books and records of Zeek, which were non-existent, nor otherwise made any determination of whether or not the profits were legitimate, which they were not.

Additionally, co-conspirators hired accountants and tax attorneys and touted their advice and approval of the legality and legitimacy of Zeek to victim-investors and others in emails, letters, and conference calls, with regard to issuing Forms 1099s for all constructive income received. In reality, these accountants and attorneys could not have reviewed the actual books or records of Zeek, which were non-existent, or otherwise made any determinations of whether or not the profits were legitimate, which they were not.

### F.    The Crumbling of the Scheme

As the Ponzi scheme grew in size and scope, banks and other financial institutions began to question the co-conspirators about the fraudulent appearance of the scheme and many shut

5

down or refused to open Zeek bank accounts. However, Defendant Burks and other co-conspirators falsely told victim-affiliates that Zeek had merely outgrown its banks.

As the scheme continued and the number of victim-investors grew, the outstanding liability to victims resulting from the bogus 125% return on investment continued to rise beyond control. Indeed, by August 16, 2012, there were approximately 3 billion outstanding VIP Bid points in the RPP, which the co-conspirators fraudulently represented to victims as their earnings. Yet, the co-conspirators had no accurate books and records to even determine how much cash on hand was available to redeem the victims' VIP Bid points. In truth and fact, by August 17, 2012, the co-conspirators had only $320 million (approximately 11% of $3 billion) in actual funds to pay out to victim-investors, and much of that money was not even accessible.

In 2011 alone, Burks received approximately $11 million in income from ZeekRewards out of total revenue of approximately $37 million.

## G. The Tax Fraud (Klein) Conspiracy

Defendant Burks and others paid themselves large salaries and other payments from victim-investors' funds and did not keep accurate and complete records of the payments. Defendant Burks and others used multiple bank accounts and internet based electronic payment services ("e-wallets"), including e-wallets located outside of the United States, to deposit funds from victim-investors and to make Ponzi payments to victim-investors and did not keep accurate and complete records of these accounts and services. Rex Venture Group, ZeekRewards, and Zeekler failed to file any corporate tax returns or to make any corporate tax payments to the IRS.

For tax year 2011, Defendant Burks, and others issued many IRS Form 1099s to victim-investors that purportedly reported the "income" received by the victim-investors for their participation in the scheme. Defendant Burks also engaged attorneys and tax professionals to

6

legitimize the issuance of the 1099s. However, in truth and fact, the vast majority of income reported to the IRS was fictional and had neither been earned nor received by the victim-investors. In total, Defendant Burks, and others, reported to the IRS supposed income by the victim-investors of over $96 million for the year 2011 on the 1099s issued, while ZeekRewards actually paid out less than approximately $13 million in cash to victim-investors during that year. As a result, individual victim-investors filed false tax returns with the IRS reporting phantom income that they never actually received, and Burks, and others were able to use the false tax notices to perpetuate the Ponzi scheme by making the phantom money seem like it actually existed.

## III.   COUNT ONE:  CONSPIRACY

Defendant Burks is charged in Count One with conspiracy to commit mail fraud and wire fraud in furtherance of a scheme to defraud victims in violation of Title 18, United States Code, Section 371. That statute provides as follows:  "If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a felony]."

"As a general proposition, the elements of a conspiracy offense are: an agreement among the defendants to do something which the law prohibits; knowing and willing participation by the defendants in the agreement; and an overt act by the defendants in furtherance of the purpose of the agreement." *United States v. Hedgepeth*, 418 F.3d 411, 420 (4th Cir. 2005) (internal quotation marks omitted).

### A.   Agreement

The Government first must prove that an agreement existed to do something which the law prohibits. *Id*. Although the agreement is the heart of the crime of conspiracy, the agreement

7

need not be expressly stated or be in writing or cover all of the details of its execution. "It is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice." *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991).

The existence of the agreement may be proved by inference from the actions and statements of the conspirators themselves, and from the circumstances of the particular scheme. *Glasser v. United States*, 315 U.S. 60, 80 (1942). Likewise, proof of the agreement "need not be direct, but may be inferred from circumstantial evidence. Moreover, once a conspiracy is established, even a slight connection between a defendant and the conspiracy is sufficient to include him in the plan." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (internal citation and quotation marks omitted). As the Fourth Circuit has summarized:

> [T]he gravamen of the crime of conspiracy is an *agreement* to effectuate a criminal act. By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement. Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. Indeed, a conspiracy may be proved wholly by circumstantial evidence. Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy. A conspiracy, therefore, may be inferred from a development and collocation of circumstances. Circumstantial evidence sufficient to support a conspiracy conviction need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt.

*United States v. Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996) (internal citations and quotation marks omitted).

Here, Defendant Burks worked within an organization, of which he was the head, pursuant to a common purpose. His conduct and communications are replete with Burks working in agreement with Dawn Wright-Olivares and Daniel Olivares and others to perpetuate the

8

scheme. Thus, there should be no dispute at trial regarding the first element, or as to the existence of the conspiracy.

### B. Knowing Participation

The Government must also prove "knowing and willing participation by the defendants in the agreement." *Hedgepeth*, 418 F.3d at 420. Whether his participation in the conspiracy was willing and voluntary should be a non-issue in the trial. There can be little argument that the defendant was an involuntary member of the conspiracy. No mind control or coercion was present in this case. Rather, the crux of this case likely will center on whether the defendant was a *knowing* participants in the conspiracy. He likely will argue that he was an unwitting participant who was duped, ignorant of the fraudulent aims of the conspiracy.

The Government may prove knowledge by willful blindness, although such hardly will be necessary here. *See United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir. 1994); *United States v. Tortora*, 30 F.3d 334, 339 (2d Cir. 1994) (approving conscious avoidance instruction when "[a] rational juror could be persuaded beyond a reasonable doubt that [the defendant] consciously closed her eyes to the high probability that her application contained falsehoods and that the loan was fraudulent."). The Supreme Court has recently considered the applicability of willful blindness and found that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011) (considering in a patent infringement case the use of the willful blindness theory in criminal cases). As the Fourth Circuit has noted:

> There are cases where the evidence demonstrates that a defendant undertook an active and deliberate effort to avoid imbuing himself with the knowledge that would support a criminal conviction. To allow the most clever, inventive, and sophisticated wrongdoers to

9

hide behind a constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right.

*United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012), *cert. denied,* 133 S. Ct. 843 (2013).

"The government can satisfy the knowledge requirement by showing either that [the defendant] actually knew of the conspiracy, or that he was willfully blind to it by purposely clos[ing] his eyes to avoid knowing what was taking place around him." *United States v. McIver*, 470 F.3d 550, 563-64 (4th Cir. 2006) (internal citations and quotation marks omitted). Likewise, the Fourth Circuit has recognized that "a conspiracy can have an elusive quality and that a defendant may be convicted of conspiracy with little or no knowledge of the entire breadth of the criminal enterprise." *Burgos*, 94 F.3d at 858. Put simply:

> [T]he Government need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators. Indeed, a defendant properly may be convicted of conspiracy without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part.

*Burgos*, 94 F.3d at 858 *(*quoting *United States v. Roberts,* 881 F.2d 95, 101 (4th Cir. 1989) (internal quotation marks omitted)); *see also United States v. Morsley*, 64 F.3d 907, 919 (4th Cir. 1995) ("A conspirator need not have had actual knowledge of the co-conspirators or of the details of the conspiracy.").

The government is not required to establish precisely when the defendant formed the intent to defraud and "even if an individual had innocent intent at the outset, a mail or wire fraud conviction can be sustained if that individual used the mail or wire communications to

disseminate falsehoods designed to calm nervous buyers." *United States v. Curry,* 461 F.3d 452, 458 (4th Cir. 2006).

There will be more than enough evidence to show that Defendants Burks was a knowing participant in the conspiracy. As discussed above, the simplest proof of Defendant Burks intent is that he daily created a false statement about Zeek's profits – a false statement that Burks knew would be distributed to thousands of investor-victims, and which he knew would result in more victims parting with their money. Furthermore, the jury will hear Burks, in his own words and in his own voice, tell victim-investors that the "profits" related to the penny auctions, which was not true. Put simply, Burks lied daily to obtain hundreds of millions of dollars for the scheme. Proof of knowledge should be overwhelming.

### C.     Evidence of Motive

"[M]otive is relevant to the requisite element of fraudulent intent," generally. *See Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 203 (4th Cir. 1988); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (noting that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). Evidence of compensation is relevant and admissible to prove motive, especially in conjunction with a limiting instruction. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006);[2] *United States v. Schnabel*, 939 F.2d 197, 201-02 (4th Cir. 1991) (approving admission of evidence of financial motive.).

---

[2]     Citing several cases on the subject, the Second Circuit noted that "[w]hile evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth." *Id.*

Here, as noted, Burks took over $11 million from the scheme for himself and his family members. Indeed, without evidence of Defendant's motive, the jury may be left confused as to *why* Defendant engaged in the fraud. Accordingly, this evidence of Defendant's financial motive should be admitted.

### D.    Defendant on Notice of Fraudulent Nature of Scheme

Burks was aware that ZeekRewards had numerous similarities to a known fraud. Prior to the launch of ZeekRewards in January 2011, the SEC shut down a company called AdSurfDaily, Inc. (ASD) in 2008. In fact, in November 2010, the owner of ASD, Thomas "Andy" Bowdoin, Jr. was indicted for wire fraud and securities fraud for the operation of ASD. ASD purported to be a mulit-level marketing business in which individuals could buy advertisements on their "network", and earn a lot of money watching and clicking ads. Participants were known as advertisers, and purchased "ad units." "Advertisers" could "earn income" by watching and clicking on the ads, and referring other "advertisers." The income was supposedly totaled daily as "rebates" up to 8%.

ASD, like ZeekRewards, was promoted as an "income opportunity" wherein members would be paid a so-called "rebate" of "up to 125%" of the money that members paid in, and provided that members to a very brief task (in ASD this was logging onto ASD's website and spend a few minutes each day looking at other member's websites).

Burks and his co-conspirators were very aware of ASD and of the fact that it was shut down. For example, on March 26, 2011, a few months after the owner of ASD was indicted, Burks and Dawn Wright-Olivares emailed regarding an affiliates advertisement for ZeekRewards that included in the title, "[i]f you were in ASD or AVG then you will know how good this is." And in the same email, the conspirators showed that they knew the import of ASD. The affiliate

12

was told to be "careful with [her] subject line" and Wright-Olivares added: "We cannot have ZeekRewards compared to ASD or AVG EVER for ANY REASON. They were both shut down. We are very very different from both companies." Similarly, on June 28, 2011, over skype, Wright-Olivares told Burks that changes needed to be made to the program to make it sustainable; Burks retorted: "I'm the one with my neck in the noose…not you…If the swat team shows up it's MY ass in the can…" Wright-Olivares responded, "[i]'ll be there too… they will seize it all and we are liable ask the ASD people."

Evidence that a defendant was on notice to the fraudulent nature of his scheme based on his knowledge of the fraudulent nature of similar schemes is obviously admissible to prove knowledge. *See United States v. Staggs*, 136 F. App'x 63, 66 (9th Cir. 2005) (citing *United States v. Rogers*, 321 F.3d 1226, 1229–30 (9th Cir.2003)).

### E. Overt Act

To establish a conspiracy under Section 1349, the Government need not prove an overt act. *United States v. Chinasa*, 489 F. App'x 682, 685-86 (4th Cir. 2012) ("§ 1349 does not contain any overt act requirement. An overt act is an element under the general conspiracy statute, which requires as an element that one or more of the conspirators do an act to effect the object of the conspiracy. Section 1349, however, does not contain equivalent language.").

## IV. COUNT TWO: MAIL FRAUD

Count Two charges Defendant Burks with committing mail fraud in violation of Title 18, United States Code, Section 1341. Section 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing

13

whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . [is guilty of a felony].

18 U.S.C. § 1341. The Fourth Circuit has held that there are "two essential elements" to mail fraud. *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). "In order to prove mail fraud, the Government must prove that the defendant (1) knowingly participated in a scheme to defraud and (2) mailed, or caused to be mailed, anything for the purpose of executing such scheme." *United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005) (internal quotation marks omitted).

### A. Knowing Participation in Scheme to Defraud

The Government first must prove that Defendant Burks knowingly participated in a scheme to defraud. The scheme to defraud here is the same scheme alleged to have been the subject of the conspiracy alleged in Count One, and discussed above. Likewise, proof of his knowing participation in the scheme to defraud is the same as the proof that he was a knowing participant in the conspiracy. Accordingly, the points made above are not repeated here.

### B. Use of Mails to Execute Scheme

The Government also must prove use of the mails or a private carrier to execute the scheme. The Fourth Circuit has explained that "[a] person 'causes' the mails to be used when he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pierce*, 409 F.3d at 232 (internal quotation marks omitted). "[U]se of the mails does not need to be an essential part of the fraudulent scheme." *United States v. Edwards*, 188 F.3d 230, 235 (4th Cir. 1999). It is enough that the mailing be "incident to an essential part of the scheme, or a step in [the] plot," *Schmuck v. United States,* 489 U.S. 705, 711 (1989) (internal citations and quotation marks omitted); *Pierce*, 409 F.3d at 232 ("Importantly, the use of the mails need not

14

[itself] be an essential element of the scheme."). In fact, "the use of the mails can be proven through evidence of business practice or office custom." *United States v. Delfino*, 510 F.3d 468, 471 (4th Cir. 2007) (citing *United States v. Scott,* 730 F.2d 143, 146-47 (4th Cir. 1984)). Here, there were numerous mailings in furtherance of the scheme to defraud.

Any argument from Defendant Burks that he did not mail anything personally would be irrelevant (as well as false). As the Fourth Circuit has explained, "[t]he government need not show that [the defendant] mailed anything himself, nor that he intended the mails be used to carry out the fraud." *United States v. Locklear*, 829 F.2d 1314, 1318 (4th Cir. 1987) (internal citations omitted). Rather, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* (internal citations omitted). Here, Defendant Burks knew that documents would be mailed in the ordinary course of his business and fraud scheme.  For example, Defendant Burks knew that victim-investors were mailing checks and money-orders from all over the country to purchase VIP bids so that they could participate in the retail profit pool of ZeekRewards.  As another example, Defendant Burks knew that the false Forms 1099 were mailed to numerous victim-investors from Charlotte, North Carolina.

## V. COUNT THREE: WIRE FRAUD

Count Three charges Defendant Burks with committing wire fraud in furtherance of the scheme to defraud, in violation of Title 18, United States Code, Section 1343.  Wire fraud has "two essential elements: (1) the existence of a scheme to defraud and (2) the use of . . . wire communication in furtherance of that scheme."  *United States v. Curry*, 461 F.3d 452, 457 (4th

Cir. 2006) (citing *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001); *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995)).

### A.  Scheme to Defraud

As with the mail fraud count, for the wire fraud count, the Government first must prove that Defendant Burks knowingly participated in a scheme to defraud. The scheme to defraud here is the same scheme alleged to have been the subject of the conspiracy alleged in Count One, and discussed above. Likewise, proof of his knowing participation in the scheme to defraud is the same as the proof that he was a knowing participant in the conspiracy. Accordingly, the points made above are not repeated here.

### B.  Use of Wire Communication

The Government also must also prove that Burks used a wire communication in furtherance of the scheme. Here, there will be no true dispute on this point. The conduct involved numerous emails, wires, phone calls, and internet transmissions. *E.g.*, *United States v. Lay*, 612 F.3d 440, 447 (6th Cir. 2010) (email sufficient to meet wiring requirement); *United States v. Selby*, 557 F.3d 968, 979 (9th Cir. 2009) (same).  Additionally, the information for the false Forms 1099 was emailed to Charlotte, North Carolina, where the returns were prepared. Subsequently, the information was submitted by wire to the IRS, through an intermediary, from an office in Charlotte, North Carolina.

## VI.  COUNT FOUR: TAX FRAUD CONSPIRACY

Count Four charges Defendant Burks with tax fraud conspiracy, otherwise known as a "Klein" conspiracy.

A *Klein* conspiracy is comprised of three elements: (1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the [agreement's] objectives, and (3) an  intent on the part of the conspirators to agree, as well as to defraud the United

16

States. The offense comprehends any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.

*United States v. Vogt*, 910 F.2d 1184, 1202 (4th Cir. 1990) (internal quotations and alterations omitted).

### A. Agreement

As with Count One, for Count Four, the Government first must prove the existence of an agreement. Here, as noted, Defendant Burks and others agreed to paid themselves large salaries and other payments from victim-investors' funds and did not keep accurate and complete records of the payments, agreed to use multiple bank accounts and e-wallets, and to make Ponzi payments to victim-investors and did not keep accurate and complete records of these accounts and services. Burks and others also agreed to issue IRS Form 1099s to victim-investors that reported the bogus "income" neither earned nor received by the victim-investors. Accordingly, there will be overwhelming evidence of an agreement.

### B. Overt Act

The Government next must prove that one of the conspirators committed an overt act in furtherance of the agreement's objective to defraud the United States. This too will be easily shown. As alleged in the indictment, during 2012, Defendant Burks and his co-conspirators filed or caused to be filed false IRS Forms 1099 in the names of victim-investors with the IRS which reported fictional income. Likewise, during 2011 and 2012, Defendant Burks and others in the agreement opened numerous bank accounts and used e-wallets, including e-wallets based in foreign countries, to receive and disburse the fraudulent payments in the scheme. There will be evidence of numerous specific examples of this conduct introduced at trial.

**C.**     **Intent to Agree and to Defraud the United States**

Finally, the Government must prove an intent to agree and to defraud the United States. As Courts have explained, "where the conspirators have effectively agreed to falsify IRS documents to misstate or misattribute income . . . the factfinder may infer a purpose to defraud the government by interfering with IRS functions." *United States v. Mubayyid*, 658 F.3d 35, 57 (1st Cir. 2011). Here, to take just one example, Burks knew the income he reported on the 1099s to victims was illusory, yet he still issued them.

**VII.     EVIDENTIARY ISSUES**

**A.**     **Hearsay and Confrontation Issues**

1.     <u>Non-Hearsay:  Defendant and Defendant's Agent Admissions</u>

During its case-in-chief, the United States will present statements, both oral and written, made by the defendant or his agents. Such statements are admissions; and as such they are substantive evidence and not hearsay, and are admissible under Federal Rule of Evidence 801(d)(2)(A). Whereas the oral statements are self-evident admissions by the relevant defendant, the written materials -- which in this case include business records created by the defendant or at his direction -- are also non-hearsay admissions. *United States v. Williams*, 837 F.2d 1009, 1013 (11th Cir. 1988). This is also true for statements made by authorized agents of the defendant pursuant to and within the scope of that agency, which are therefore admissible under Federal Rule of Evidence 801(d)(2)(D).

Statements by Defendant Burks's attorney, his affiliates, and other agents are admissible against him pursuant to this rule. *United States v. Martin*, 773 F.2d 579, 583 (4th Cir. 1985) (holding that statements made by attorney to IRS auditor was admissible in subsequent

18

prosecution for tax evasion where statement was made by attorney during course of representation of client); *McKiver v. General Elec. Co.*, 11 F. Supp. 2d 755, 760 n.4 (M.D. N.C. 1997) ("The statements made by Plaintiff's attorney in a letter to her explaining why her ADA claim lacks merit are admissible under Fed. R. Evid. 801(d)(2).").

In other instances, statements may be offered for their effect upon the listener. For example, some victims may testify about what other non-testifying witnesses told them about ZeekRewards. Such statements are not being introduced for their truth. Rather, such testimony would be offered to show the investor witness's state of mind prior to investing, and to explain why the witness decided to invest. *See United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002) ("An out-of-court statement that is offered to show its effect on the hearer's state of mind is not hearsay under Rule 801(c)."); *United States v. Paredes-Rodriguez*, 160 F.3d 49, 57 (1st Cir. 1998) (testimony admitted for the limited purpose of showing what prompted witness to take subsequent action).

### 2. Inadmissible Hearsay: Defendant's Own Out-of-Court Statements

It is well-established under the hearsay rules that a defendant may not avoid testifying by introducing his own self-serving, out-of-court statements through the testimony of another witness. Although admissions by a party opponent are not considered hearsay when admitted against that party, *see* Fed. R. Evid. 801(d)(2), the Fourth Circuit has made clear that there is no "exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (holding that the government's introduction of the defendant's inculpatory statements did not permit the defendant to introduce his exculpatory statements under the rule of completeness).

Applying these principles, courts have routinely prohibited defendants from introducing self-serving, exculpatory statements through cross-examination. *E.g., United States v. Mitchell*, 502 F.3d 931, 964–65 (9th Cir. 2007), cert. denied, 553 U.S. 1094 (2008) (affirming ruling that prohibited the defendant from asking agents on cross-examination about exculpatory statements the defendant made during interviews). This is because a defendant may not avoid cross-examination by eliciting his own self-serving, out-of-court statements through other witnesses during the government's case-in-chief or otherwise. As the Eleventh Circuit has noted, "[t]his is precisely what is forbidden by the hearsay rule." *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985) (recognizing that the defendant's attempts to elicit his own exculpatory post-arrest statements through cross-examination of the arresting officer were "[o]bviously" designed "to place [the defendant's] remarks before the jury without subjecting [him] to cross-examination"). Nor does the rule of completeness allow a defendant to sneak in his own self-serving hearsay. *United States v. Hassan*, 742 F.3d 104, 134 (4th Cir.), *cert. denied,* 135 S. Ct. 157 (2014) ("Nor does the rule of completeness require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party.") (quotation omitted). Accordingly, the Court should preclude the defendant and any defense witness from testifying as to the defendant's out-of-court statements.

B.     **Lay Witness Issues**

1.     <u>Defendant Lay Witness Testimony as to Defendant's Mental State</u>

It would be inappropriate for any lay witness to give an opinion in the form of testimony about the defendant's mental state, especially that the defendant did not intend to defraud anyone or relied on another person's advice. Any such testimony would have to be both based on

20

personal knowledge pursuant to Rule 602 and helpful pursuant to Rule 701. As the Court of Appeals for the Third Circuit has explained,

> While we have never held that lay opinion evidence concerning the knowledge of a third party is *per se* inadmissible, we have certainly made this kind of evidence difficult to admit. If the witness fails to describe the opinion's basis, in the form of descriptions of specific incidents, the opinion testimony will be rejected on the ground that it is not based on the witness's perceptions. To the extent the witness describes the basis of his or her opinion, that testimony will be rejected on the ground that it is not helpful because the fact finder is able to reach his or her own conclusion, making the opinion testimony irrelevant.

*United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003) (citations omitted); *see United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) ("When the issue is a party's knowledge, which is perhaps a more easily fathomed state of mind than, for example, intent or motivation, we suspect that in most instances a proffered lay opinion will not meet the requirements of Rule 701."). Put differently, witnesses who are not mind-readers cannot have personal knowledge of the defendant's mental state. And, to the extent that some fact observed by the witness may be relevant to the defendant's mental state, the witness may testify directly as to that fact and allow "the fact finder . . . to reach his or her own conclusion," 336 F.3d at 242, about the defendant's mental state. Any deduced opinion by the witness as to the defendant's mental state is irrelevant pursuant to Rule 701.

### 2. Victim Testimony

The Government will necessarily call victims to testify about the representations made to them, why they provided money to the scheme, and whether they were victimized. Any testimony about the impact of the fraud upon the victims will be limited and proper. As the Fourth Circuit recognized in *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012), victim-impact testimony is relevant and admissible to show an intent to defraud where a defendant denies an

intent to defraud, because "'[p]roof that someone was victimized by the fraud is . . . treated as some evidence of the schemer's intent.'" *Id.* at 402 (quoting *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994)) (brackets in original); *see also United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) (recognizing that "when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence"); *United States v. Foshee*, 606 F.2d 111, 113 (5th Cir. 1979) ("Fraudulent intent is supported by proof that someone was actually victimized by the fraud." (internal quotation marks omitted)). Because the Government must prove intent to defraud in proving mail and wire fraud, evidence of a victim's losses is relevant and admissible. *Cf. United States v. Susi*, 378 F. App'x 277, 283 (4th Cir. 2010) (unpublished) (noting that the prosecutor's questioning of elderly witnesses about their age, the origin of the money they sent to call centers, and the hardships resulting from the loss of their money was "relevant and proper").

### 3. Lay Testimony by Those With Specialized Knowledge

Some of the Government's lay fact witnesses may testify as to their personal understanding and involvement with the scheme or its players, and may discuss their own understanding of accounting or multilevel marketing in the context of their involvement. These may include lawyers, accountants, and or consultants who worked with Defendant Burks and Zeek, as well as co-conspirators. All such lay testimony will be proper. Recently, the Second Circuit confirmed that accountants testifying as lay fact witnesses could properly answer even "what-if-you-had-known" questions when their testimony, including answers to those hypotheticals:

> [W]as limited by the factual foundation laid in earlier admitted testimony and exhibits, the factual nature of the hypotheticals, and the witnesses' reasoning, which was based on undisputed accounting rules. These limitations left little room for the witnesses to engage

in speculation and ensured that their testimony fell near the fact end of the fact-opinion spectrum.

*United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013). Thus, it was proper for those lay witnesses to testify about "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements." *Id.* at 456. So, too, here, those witnesses personally involved with Zeekrewards will provide factual testimony about how they acted and viewed matters, and how those actions and views may have been different had they known the full facts.

Nevertheless, such witnesses cannot make blanket assertions that a defendant did nothing wrong; the Court should prevent lay witness testimony when it involves 'meaningless assertions which amount to little more than choosing up sides.' *United States v. Offill*, 666 F.3d 168, 177-78 (4th Cir. 2011) (quoting *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 110–11 (4th Cir.1991) (quoting Fed.R.Evid. 701, Advisory Committee Note).

Furthermore, witnesses cannot testify as to the law, which is the province of the Court. Decisions regarding the law are for the court, not expert or lay witnesses. *See In re Initial Public Offering Servs. Litig.*, 174 F.Supp.2d 61, 64 (S.D.N.Y. 2001) ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.") (collecting numerous cases); *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991); *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006) (citing *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir.1988) ("In no instance can a witness be permitted to define the law of the case.").

Furthermore, as stated above, such witnesses cannot testify about the Defendant's state of mind or the Defendant's intent.

## C. Other Witness Issues

### 1. Defendant Character Witnesses: Cross-Examination

The Government believes that the defendant may attempt to call character witnesses in his defense. If he does call such witnesses, cross-examination is "allowable into relevant specific instances of conduct." Fed. R. Evid. 405(a). As the Supreme Court has explained:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him . . . . Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives the defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*Michelson v. United States*, 335 U.S. 469, 479 (1948) (footnote omitted).

It should be noted that the specific acts of conduct which character witnesses are questioned about on cross-examination cannot be proven by extrinsic evidence unless it is an essential element of the charge. Fed. R. Evid. 405(b); *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978) ("while a character witness may be asked on cross-examination about 'specific instances of conduct,' such acts may not be proved by extrinsic evidence"). Accordingly, in the instant case, the Government will not attempt to prove the specific instances of conduct discussed during cross-examination by extrinsic evidence, except to the extent that such evidence would also tend to establish one of the elements of the charged offenses.

### 2. Summary Witnesses

The United States may seek to call one or more summary witnesses pursuant to Rule 611 to aid the jury in sifting through the voluminous evidence that will be presented during this multi-week trial. Admission of such testimony is within the sound discretion of the trial court, and has been repeatedly upheld by the Fourth Circuit, which has held "[i]t is well-established that a district court may admit summary testimony and summary charts, under Rule 611(a) of the Federal Rules of Evidence, if they will help the jury to better understand the evidence presented and to ascertain the truth." *United States v. Pena*, 213 F.3d 634 (Table), 2000 WL 541087, at *3 (4th Cir. Apr. 27, 2000); *see United States v. Rollack*, 173 F.3d 853 (Table), No. 98-4272, 1999 WL 104806 (4th Cir. Mar. 1, 1999) (upholding admission of FBI agent testimony summarizing evidence); *United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995) (finding that the district court acted within its discretion in allowing a summary witness because of the large amount of witnesses and extensive evidence)..

Thus, summary witnesses should be permitted in this case -- which is likely to include admission of hundreds of exhibits, and testimony of numerous witnesses -- to help aid the jury in organizing and understanding the evidence.

### 3. Expert Witnesses

The United States may call two expert witnesses: Tucker Greer of Price Waterhouse Coopers, who examined the servers of Rex Venture Group and reconstructed the data therein, and economist Peter Vander Nat, who is an expert in economic analysis specifically in the context of multi-level marketing. Proper notice of such experts has been provided in accordance with Rule 16.

Mr. Greer examined the servers and computers of Rex Venture Group and recreated the systems and data utilized by Defendant Burks and his co-conspirators during the course of the fraud scheme. Mr. Greer will testify as to his training and background, the nature of the examination that he undertook, and the methods and/or software used to assist in the re-creation. Mr. Greer will testify as to data extracted from these servers, including an analysis of dollars paid into the program; the number of victim-investors; the gains and losses to victim-investors; the source of incoming funds, including whether those funds represented VIP bid purchases, membership fees, or retail auction bids; profits obtained by Rex Venture Group; and profits relative to the auctions. Additionally, Mr. Greer will testify as to how commissions, point balances, placement of advertisement, giving away of bids, and other transactions operated within the RVG servers. Mr. Greer will also summarize information obtained in the Back Office of the victim-investors; RPP data; and number/type of outstanding bids.

Dr. Vander Nat may be called as a witness to testify based on his expertise in economic modeling. He will analyze the purported percentage of shared profit stated in ZeekRewards and opine as to whether such profits are economically feasible. Dr. Vander Nat will further opine on what rate of growth would be economically necessary to pay the profit share promoted by ZeekRewards and whether such rate of growth would be economically feasible; this analysis will involve purely mathematical computations regarding the purported growth rate that ZeekRewards would have to achieve in order to pay the promoted RPP. Vander Nat may further opine that ZeekRewards affiliates had point balancing growing at an exponential rate, that over time became more and more unfunded based on historic rates of repurchase, such that over time,

it would become impossible to pay liability for the accrued rates of return that, causing harm to all but a small percentage of affiliates.

The expert testimony of Mr. Greer and Dr. Vander Nat is appropriate expert testimony pursuant to Federal Rule of Evidence 702 and the requirements of the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137 (1999). Pursuant to Rule 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

### 4. Impeachment with Reports of Interview

Defendant should not be permitted to introduce the contents of interview reports to impeach witnesses during cross examination, publish the contents of interview reports to the jury, or otherwise suggest to the jury that the interview reports are statements of the witnesses who did not write them or adopt them. Interview reports are not statements of the witness under the Jencks Act. In *Palermo v. United States*, 360 U.S. 343 (1959), the Supreme Court held that because the Jencks Act is meant to restrict the defendant's use of discoverable statements to impeachment, *id*. at 349, "only those statements which could properly be called the witness' own words should be made available to the defense." *Id*. at 352. The Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements

which contain [an] agent's interpretations or impressions" are "not to be produced." *Id*. at 352-53.

Defendant is, of course, free to ask a witness whether he or she made a statement that is reflected in an IRS or Secret Service interview report. However, if Defendant is not satisfied with the witness's answer, Defendant should not publish or introduce the contents of the interview report as a prior inconsistent statement. *See United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); *United States v. Hill*, 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it"). Moreover, Defendant should not use the interview reports in a way that suggests to the jury that the report is a statement of the witness. *See United States v. Marks*, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (where defense counsel read from a interview report during cross-examination in a way that would "seem authoritative", the judge was entitled to require the witness be shown the interview report and given the opportunity to adopt or reject it as a statement).

### D. Evidence Against One Co-Conspirator Admissible Against All

The Government may introduce evidence at times that relates solely to a co-conspirator's participation in the conspiracy, and may not directly involve Defendant Burks. Such evidence is nevertheless relevant and admissible for at least two reasons. First, evidence relating to a co-conspirator's involvement in the conspiracy is relevant and admissible to prove the existence of the conspiracy itself. As noted above, to convict the defendant of conspiracy, the Government

first must prove the existence of "an agreement to effectuate a criminal act." *United States v. Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996).

Second, under *Pinkerton v. United States*, 328 U.S. 640 (1946), Defendant Burks may be convicted of substantive crimes or acts committed by his co-conspirators so long as such acts were in furtherance of the conspiracy and reasonably foreseeable to the relevant defendant. Put differently, if a conspirator commits a reasonably foreseeable offense in furtherance of the conspiracy, then all current members of the conspiracy may be convicted of the offense solely by virtue of his membership in the conspiracy. *E.g.*, *United States v. Basey*, 816 F.2d 980, 997 (5th Cir. 1987). Under *Pinkerton*, a conspirator is truly his brother's keeper. *See United States v. Thompson,* 286 F.3d 950, 965 (7th Cir. 2002) ("[A] defendant who joins a conspiracy risks many things -- *e.g.*, the admission of his coconspirator's statements at trial . . . , the potential conviction for substantive offenses committed in furtherance of the conspiracy, and inclusion of his coconspirator's acts in the computation of his relevant conduct at sentencing."). Accordingly, the Court should admit evidence even if it is relevant only to the acts of a co-conspirator in furtherance of the conspiracy.

### E. Documentary Evidence

#### 1. Certified Copies

The United States may offer into evidence certified copies of Internal Revenue Service records including taxpayer returns, certificates of lack of record and transcripts. Such records are self-authenticating under Rules 902(4) and 803(6), Fed. R. Evid.

The Government may also introduce testimony as to the absence of entries in various Government records, public recording offices, and the like. Such testimony is admissible under

Rules 902(4), 803(6), 803(7), and 803(10). *See United States v. Spine*, 945 F.2d 143, 148-49 (6th Cir. 1991).

### 2.    <u>Business Records</u>

A large portion of the Government's evidence consists of business records. Such records, kept in the regular course of business, are admissible as exceptions to the hearsay rule. Fed. R.Evid. 803(6). Such records are also admissible if they were received and kept by the witness and relied upon by him in his regular business, although not made by him. In other words, one may adopt as inherently trustworthy the records created by another and submitted and received in the course of business. *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977).

Pursuant to the Federal Rules of Evidence, photostatic copies are admissible as duplicate originals. Rule 1001(4) defines "duplicate" to include photocopies, and Rule 1003 provides that such duplicate originals may be used at trial to the same extent as the originals unless a genuine question as to the authenticity of the original is raised. *United States v. Morgan*, 555 F.2d 238, 243 (9th Cir. 1977).

### 3.    <u>Charts and Summaries</u>

The United States expects to use charts and summaries during the trial, pursuant to Rule 1006, and intends to offer such charts and summaries into evidence. *See United States v. Stephens*, 779 F.2d 232, 239-40 (5th Cir. 1985); *United States v. Duncan*, 919 F.2d 981, 988 (5th Cir. 1985), *cert. denied*, 500 U.S. 926 (1986). Such summaries are allowed where the "contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006. Such summaries also can speed the introduction and presentation of evidence. *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("Because the underlying documents need not be introduced into evidence,

the chart itself is admitted as evidence in order to give the jury evidence of the underlying documents.").  The defense will received notice of any such summaries and charts and will be permitted an opportunity to review them prior to their introduction at trial.  Consistent with Rule 1006, the underlying documents supporting the charts and summaries will also be made available to the defense for examination or copying.   The summaries are believed to be helpful to the trier of fact due to the voluminous nature of this evidence and thus should be admitted into evidence.

The United States may also seek to introduce into evidence pursuant to Rule 611(a) summary exhibits that will aid the jury in sifting through the extensive evidence that will be presented over this trial.  It is well established in the Fourth Circuit that "[s]ummary charts are admissible if they aid the jury in ascertaining the truth."  *See United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997) (citing *United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995)); *United States v. Pena*, 2000 WL 541087, at *3 ("It is well-established that a district court may admit summary testimony and summary charts, under Rule 611(a) of the Federal Rules of Evidence, if they will help the jury to better understand the evidence presented and to ascertain the truth.").

In making this determination, the courts look at "[t]he complexity and length of the case as well as the numbers of witnesses and exhibits."  *Loayza*, 107 F.3d at 264 (citing *Johnson*, 54 F.3d at 1159.)  Additionally, "[w]hile the potential prejudice to a defendant must be considered, prejudice may be dispelled by giving the defendant an opportunity to cross-examine the individual who prepared the chart.  In addition, a cautionary jury instruction may be requested and given."  *See id.*  (citing *Johnson*, 54 F.3d at 1159.)  The Fourth Circuit has repeatedly upheld the use and introduction into evidence of summary charts in complex cases, such as this.  *See,*

*e.g.,* *United States v. Levy*, 335 Fed. App'x 324, 2009 WL 1863687, at *327 (4th Cir. Jun. 30, 2009) (applying above standard and finding no error in admission of summary charts in mail and wire fraud case); *United States v. Hayes*, 322 F.3d 792, 799 (4th Cir. 2003) (upholding admission of summary charts); *Pena*, 2000 WL 541087, at *3-4 (same). Other Circuits are in accord. *See United States v. Ogba*, 526 F.3d 214, 225 (5th Cir. 2008) (discussing Rule 611(a) and finding summary charts properly admitted if "they accurately reflect the underlying records or testimony"); *United States v. Milkiewicz*, 470 F.3d 390, 398 (1st Cir. 2006) ("In some cases, however, such pedagogical devices may be sufficiently accurate and reliable that they, too, are admissible in evidence [under Rule 611(a)], even though they do not meet the requirements of Rule 1006."); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (finding it within the court's discretion to allow use of summary chart under Rule 611(a) and to admit such chart into evidence).

### F. Jury Nullification and Other Prohibited Arguments and Evidence

#### 1. Blame the Victim's Negligence

Defendant Burks should be precluded from arguing that negligence by his victims somehow excuses his own fraudulent conduct. For example, Burks might argue that his victims should have known that he was engaging in fraud. As discussed below, this argument is legally irrelevant to the question of Burks's guilt because it is in no way relevant to the ultimate issue at trial: whether Burks intended to provide materially false and misleading information to his investors.

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 402, in turn,

32

compels that "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402. Furthermore, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The Fourth Circuit has ruled that evidence of a victim's negligence or gullibility is immaterial to whether the defendant had fraudulent intent to engage in the fraud. *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud ... is irrelevant to the analysis. If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.") (quotation marks and citation omitted). Similarly, in *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007), the Seventh Circuit held that "the perpetrator of a fraud may not defend himself by blaming the victim for being duped." Similarly, the Second Circuit explained at length that the mail fraud statute must not be read as an invitation to criminals "to take advantage of the stupid or careless." *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004); *see also Linden v. United States*, 254 F.2d 560, 567 (4th Cir. 1958) (holding that it was not a defense to a mail fraud charge that the victims had not "read the solicitation fully"). Based on the foregoing, Burks should be precluded from making any argument or offering any evidence concerning negligence on the part of any of the defendant's victims.

        2.    <u>Alleged Wrongdoing of Others</u>

"But they did it, too," is not a defense. Accordingly, the Court should prevent Defendant

from introducing evidence or argument about other employees or advisors or contractors for ZeekRewards who were not prosecuted to distract from his own crimes. The sole question in this trial is whether Defendant committed the crimes with which he is charged. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Fed. R. Evid. 401. In other words, for evidence to be relevant "(1) [t]he evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Glasser*, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985) (quotation omitted). Evidence or argument regarding the conduct of others is irrelevant and would set up a confusing side-show.

The Sixth Circuit thus noted the "manifest illogic" of the defendants' "others did it too" argument supporting the defendants' proffered evidence in *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007). The *Vasilakos* defendants were managers charged with operating a scheme to defraud their employer. They sought to introduce evidence relating to the actions of various other officials of their employer in order to establish a "good faith" defense. *Id*. at 408. The Sixth Circuit held that such evidence was properly precluded:

> [W]e think it is obvious that the defendants' proffered evidence of similar fraud by other managers was not relevant (not 'material,' actually) because the evidence had no tendency to show that it was less probable that the defendants acted with intent to defraud, than if the evidence had been admitted.

*Id*. at 409. "Simply stated, evidence of fraudulent acts by other employees including policy making executives, would have no tendency to show that the defendants' acts were innocent." *Id*. The same is obviously true of unrelated conduct of others here. Accordingly, any such argument or evidence should be precluded.

34

3.    Government's Failure to Prosecute Certain Witnesses

Defendant should not be permitted to make any argument or evidence about the Government's decisions to immunize or not prosecute certain witnesses.  Defendant may be tempted to suggest that the jury find Defendant not guilty because others who have not been prosecuted were more culpable.  In doing so, Defendant would be asking the jury to acquit on grounds other than the facts and the law.  That type of argument is improper and should be excluded.  Such evidence or argument is irrelevant to the issue of guilt or innocence of Defendant and is outside the province of the jury.

It is well-settled that whether to prosecute a given person is a matter solely within the United States' discretion.  *Wayte*, 470 U.S. 598, 607 (1985).  Likewise, the propriety, wisdom or fairness of the United States' decision to immunize or not prosecute certain persons are not proper matters for consideration by the jury and the Court should reject any attempt by Defendant to raise those issues at trial.  *United States v. Trammel*, 583 F.2d 1166, 1168 (10th Cir. 1978) ("A defendant has no standing to contest the propriety of the grant of immunity to a witness.").

Therefore, Defendant has no right to argue to the jury the propriety of any prosecutorial decision not to prosecute the witnesses against him.  *See, e.g., United States v. Oberle*, 136 F.3d 1414, 1422-23 (10th Cir. 1998) (affirming trial court's instruction that the jury should not concern itself with the guilt of anyone other than the defendant); *United States v. Hill*, 643 F.3d 807, 863 (11th Cir. 2011) ("Even if we assume that Wilson is every bit as guilty or innocent as Brown, the government's decision not to prosecute him does not entitle her to a judgment of acquittal. . . . . [T]he law accommodates imperfection and is home to the idea that it is better to

have some justice than none.").  This issue was faced squarely by the Second Circuit in *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073-74 (2d Cir. 1977).  In *Cheung*, defense counsel argued to the jury that it should consider the "public policy implications of the [g]overnment's favorable treatment of [the] cooperating witness" and by its verdict of not guilty could send a message to the government that it did not like the "deals" it had made with the cooperating witness.  *Id*. at 1073.  The *Cheung* Court approved the trial court's charge in which the court "instructed the jury that law enforcement policy was not its concern, and [the court] admonished the jury to focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt."  *Id*.  The court found that the charge was "well chosen, accurate and appropriate" since defense counsel had urged acquittal "on the basis of extraneous public policy considerations."  *Id*. at 1073-74.  The *Cheung* Court concluded, "[t]he trial court does indeed have the right to 'spear a red herring' . . . ."  *Id*. at 1074.

4.    Specific Instances of Good or Lawful Conduct

Defendant has lived a long life, but is charged only with engaging in fraud for a limited period of time as defined by the Indictment.  In addition to the crimes for which he is charged, Defendant no doubt engaged in lengthy legitimate work throughout his life.  Likewise, it may be that Defendant has performed good acts in connection with his family or friends.

However, it is well-established that specific instances of good or lawful conduct are not admissible in a criminal trial.  *See United States v. Heidecke,* 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment."); *United States v. Scarpa,* 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the

absence of criminal acts on specific occasions.") (citations omitted). Every criminal, of course, has intervals in life in which he chooses a lawful path.

Criminal trials are not about the restraint or even good judgment the defendant may have shown in uncharged instances. *See United States v. Marrero,* 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that [the defendant] did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). Rather, criminal trials are about whether the defendant engaged in the criminal conduct for which he is charged. *See also United States v. Hill*, 40 F.3d 164, 168-69 (7th Cir. 1994) (holding that the fact that the defendant did not steal three "test letters" from the mail on other occasions was not admissible to prove or disprove his intent with regard to the stolen letters); *United States v. Camejo,* 929 F.2d 610, 613 (11th Cir. 1991) (drug defendant properly precluded from introducing evidence that he refused an opportunity to become involved in a different narcotics business).

Thus, the court in *United States v. Warner*, 396 F. Supp. 2d 924 (N.D. Ill. 2005), properly barred former Illinois Governor Ryan from submitting evidence of his legitimate work while in office, such as commuting death sentences. *Warner*, 396 F. Supp. 2d at 942 (N.D. Ill. 2005). The court rejected Ryan's argument that this evidence was necessary to show "what Ryan *did* in office: how Ryan spent his time, what issues had his attention, what was important to him." *Id*. at 941. As the court noted, "Ryan was no doubt conducting day-to-day, legitimate activities in his positions as Secretary of State and Governor of Illinois, but may also have engaged in fraudulent activities." *Id*. The court concluded that the evidence was properly excluded because, "Ryan's legitimate official acts, such as commuting death sentences, are not alleged to be part of the

scheme or conspiracy to commit fraud. Nor are such decisions admissible extrinsic evidence of intent." *Id.* at 942. So, too, Defendant's professional or personal "legitimate activities," are not admissible extrinsic evidence of intent, and should be precluded.

### 5. Impact of Conviction on Defendant's Family

Defendant should not be permitted to draw attention to his family at trial, including their need for support, either financial or emotional, nor the effect of a conviction upon them. This kind of information is irrelevant and amounts to nothing more than an appeal to the sympathy of the jury. *See, e.g., United States v. Ramirez*, 482 F.2d 807, 816 (2d Cir. 1973); *United States v. D'Arco*, 1991 WL 264504, at *4 (N.D. Ill. Oct. 18, 1991) (holding that "no testimony or argument will be allowed regarding the impact of the trial or possible conviction upon a family member"). Personal or familial consequences of trial or conviction should play no part in the jury's deliberations as to whether Defendant is guilty of the crimes charged.

### 6. Penalties Faced by Defendant

Defendant Burks should not be permitted to introduce evidence, make argument, or otherwise mention the potential penalties he faces if convicted. The potential penalty faced by Defendant is irrelevant to the jury's determination of guilt or innocence. *See* Fed. R. Evid. 401; *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should reach its verdict without regard to the sentence that might be imposed); *United States v. Shannon*, 981 F.2d 759, 761 (5th Cir. 1993) ("The well-established general principle is that a jury has no concern with the consequences of its verdict. . . . This Circuit has long recognized that punishment and sentencing are matters entrusted exclusively to the trial judge.") (quotation omitted). While the law prohibiting such references to potential penalties is clear, the Government respectfully requests

that the Court be vigilant to questions of government witnesses designed to elicit answers, which would properly bear upon their credibility, about the potential punishment maximums the witnesses face or have faced. These answers should not be used as a basis for argument to the jury that it should consider those potential punishments when determining the guilt or innocence.

### 7. Vouching/Defense Attorneys as Witnesses

As stated in the Government's Second Motion in Limine (Doc. 78), defense counsel must be prohibited from both (1) inserting themselves in as fact witnesses during questioning of any witnesses; and (2) vouching for Defendant Burks or for or against any Government or defense witness based on knowledge that they gained during the fraud scheme. The case law relevant to this issue is discussed in the Government's motion.

### 8. Civil Settlements by Witnesses

As stated in the Government's Second Motion in Limine (Doc. 78), pursuant to Federal Rule of Evidence 408, evidence of civil settlements is not generally admissible. *See United States v. Arias*, 431 F.3d 1327, 1337-38 (11th Cir. 2005) (holding that evidence of civil settlements is inadmissible in criminal cases under FRE 408).

However, Federal Rule of 408 does state that a court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. FRE 408(b).

The Government does not believe that these civil settlements, in which the parties neither admitted nor denied guilt, have any relevance to the criminal trial of Defendant Burks. To the extent that the Court allows Defendant Burks to use any witness's settlement with the Receiver or with the SEC in this case for such a limited purpose, then the Government must also be

permitted to introduce Defendant's own settlement with the SEC and settlement with the Receiver into evidence, with an appropriate limiting instruction.

### G. Sequestration

The United States requests that the case agents be exempted from Rule 615's sequestration as designated representatives of the United States. Fed. R. Evid. 615(2); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). The Government requests that all other potential witnesses for both the Government and the defense be excluded from the courtroom and prohibited from discussing the evidence introduced during the trial.

## VIII. FORFEITURE

The Indictment provided notice that the Government intends to pursue a forfeiture money judgment. Criminal forfeiture of property constitutes part of the sentence in a criminal case and enhances the punishment of a defendant who has already been convicted of a particular offense. *United States v. Cherry*, 330 F.3d 658, 670 (4th Cir. 2003). As discussed more fully below, forfeiture issues should be addressed in the "forfeiture phase," of a bifurcated proceeding, following the entry of any guilty verdict as to any count for which there is statutory authority for forfeiture.

### A. Statutory Bases for Forfeiture

Provided that Defendant is convicted of any of Counts One, Two, or Three, forfeiture of proceeds is appropriate as provided for in 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2). *See* 28 U.S.C. § 2461(c) (incorporating section 981 in criminal forfeiture). As discussed in detail below, Federal Rule of Criminal Procedure 32.2(b)(1) provides for the issuance of a money judgment for the amount of specific property that would be directly forfeitable if such specific property traceable to the offenses was available in the instant case.

40

**B.     Forfeiture Procedure**

In the event that Defendants are convicted of one or more of the conspiracy to commit fraud and fraud counts identified above, and if they requests a jury determination of the amount of the forfeiture money judgment pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), the Government objects to such request.  The plain language of Rule 32.2(b)(1), the rule applicable to forfeiture, contemplates that the Court, and not the jury, make the ultimate determination on forfeiture in the instance of a money judgment.  Rule 32.2 sets forth the procedures governing criminal forfeiture and codifies each party's right to a jury determination on forfeiture.  In order for a jury to determine a forfeiture issue, either the plaintiff or the defendant must, following the entry of a guilty verdict, request that the jury make such determination.  Specifically, Rule 32.2(b)(4) provides:

> Upon a party's request in a case in which a jury returns a verdict of guilty, the jury must determine *whether the government has established the requisite nexus between the property and the offense* committed by the defendant.

Fed. R. Crim. P. 32.2(b)(4) (emphasis added).  If a jury verdict is requested, the jury must decide whether the government has proven elements necessary for the Court to declare property forfeited.  It is not necessary for the jury to determine the extent of Defendant's interest in the property[3] -- that issue is left for the ancillary proceedings that follow entry of a Preliminary Order of Forfeiture.  Fed. R. Crim. P. 32.2 (*Advisory Committee Notes*).  The sole duty of the

---

[3]     "Since the enactment of the ancillary proceeding statutes, the requirement in Rule 31(e) that the court (or jury) determine the extent of the defendant's interest in the property as part of the criminal trial has become an unnecessary anachronism that leads more often than not to duplication and a waste of judicial resources."  Fed. R. Crim. P. 32.2(b)(4) (*Advisory Committee Notes*).

jury is to determine whether the Government has established the requisite nexus between the property allegedly subject to forfeiture and the offense for which the defendant was found guilty. In this case, the Government does not seek the forfeiture of any specific property. As a result, there is no nexus to determine. *See* Rule 32.2(b)(1) ("If the government seeks forfeiture of *specific property*, the court must determine whether the government has established the *requisite nexus between the property and the offense*.") (emphasis added).

Instead, the Government seeks a money judgment representative of the total amount of proceeds obtained. The only determination to be made is a calculation of the amount, not a determination of whether a nexus exists between the forfeitable property -- the directly traceable criminal proceeds that are no longer available -- and the crime. *See* Fed. R. Crim. P. 32.2(b)(1) ("If the government seeks a *personal money judgment*, the court must determine *the amount of money* that the defendant will be ordered to pay.") (emphasis added). Therefore, since a money judgment, as opposed to a specific directly traceable asset, is at issue in the instant case, Defendants do not have a right, pursuant to Rule 32.2(b)(4), to request a jury determination of the amount of a money judgment. Furthermore, there is no constitutional right to a jury determination of the forfeiture of property. *See United States v. Libretti*, 516 U.S. 29, 49 (1995) ("the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection").

If the Court does allow a jury determination of the amount of the money judgment, the jury must answer questions which will allow the Court to enter the order of forfeiture. *See Cherry*, 330 F.3d 658, 670 (4th Cir. 2003) (noting that jury returned special verdict as to amount

of proceeds but agreeing that judgment of forfeiture could not stand as to proceeds tied to vacated count); *United States v. Amend*, 791 F.2d 1120, 1128 (4th Cir. 1986), *cert. denied*, 479 U.S. 930 (1986) (noting that precursor to Rule 32.2 provided for special verdict on extent of property subject to forfeiture and affirming method whereby the jury determined forfeitability by answering questions as to whether specific property was acquired through criminal enterprise, but finding a verdict, that generally discussed profits and did not specify amount, on a general catch-all category of assets, tautological).  Since the preponderance of the evidence burden of proof, and not the beyond a reasonable doubt burden, applies at the forfeiture stage of a criminal proceeding, in answering such questions, the jury must apply the preponderance of the evidence burden of proof.  *See Cherry*, 330 F.3d at 669-70 (4th Cir. 2003) (upholding preponderance of the evidence jury instruction); *United States v. Tanner*, 61 F.3d 231, 233 (4th Cir. 1995) (holding that preponderance standard governs forfeiture cases).

The portion of the Indictment entitled "Notice of Forfeiture and Finding of Probable Cause" should not be read to the jury, and the term "forfeiture" should not be mentioned to the jury until after innocence or guilt is decided.  Hence, *bifurcated proceedings are required*.  *See* Fed. R. Crim. P. 32.2(b)(1) (discussing forfeiture proceedings conducted after verdict or finding of guilty).  The portion of the Indictment entitled "Notice of Forfeiture and Finding of Probable Cause" is merely a notice to defendants that the Government seeks to forfeit his property.  *See* Fed. R. Crim. P. 32.2(a) (*Advisory Committee Notes*) (discussing notice to defendants).

## IX.    CONCLUSION

The foregoing is a summary of some of the points that the Government anticipates are likely to arise at trial. Should any legal issues arise that are not covered in this trial brief, the Government respectfully requests leave to submit further memoranda as necessary to assist the Court.

Respectfully submitted this the 24th day of June, 2016 by:

<div style="margin-left:40%">

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

s/Jenny G. Sugar
JENNY G. SUGAR
ASSISTANT UNITED STATES ATTORNEY
Member New York Bar
Attorney for the United States
227 West Trade Street, Suite 1650
Charlotte, NC 28202
(704) 344-6222 (office)
(704) 227-0197 (facsimile)
Email: jenny.sugar@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June 2016, the foregoing document was served electronically through ECF filing upon the defendant through counsel of record

s/Jenny G. Sugar
JENNY G. SUGAR
ASSISTANT UNITED STATES ATTORNEY