**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

——————————

**No. 17-4143**

——————————

UNITED STATES OF AMERICA,

　　　　　　　　　Plaintiff - Appellee,

　　　v.

PAUL BURKS,

　　　　　　　　　Defendant - Appellant.

——————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:14-cr-00208-MOC-DSC-1)

——————————

Argued:  March 22, 2018　　　　　　　　　　Decided:  August 23, 2018

——————————

Before WILKINSON and TRAXLER, Circuit Judges, and Leonie M. BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.

——————————

Affirmed by unpublished opinion. Judge Brinkema wrote the opinion, in which Judge Wilkinson and Judge Traxler joined.

——————————

**ARGUED:**  Noell Peter Tin, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Jacob H. Sussman, C. Melissa Owen, Emily D. Gladden, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant.  Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

——————————

Unpublished opinions are not binding precedent in this circuit.

BRINKEMA, District Judge:

After a jury trial, Paul Burks was found guilty of conspiracy to commit mail and wire fraud, substantive mail and wire fraud, and conspiracy to defraud the United States by impairing the lawful functions of the Internal Revenue Service. He was sentenced to 176 months incarceration concurrent on the counts involving mail and wire fraud, and 60 months concurrent on the conspiracy to defraud count, as well as being ordered to forfeit $244 million. He appeals these convictions arguing that the district court erred by not granting his pretrial motion to dismiss the tax fraud conspiracy charge, by denying his motion for judgment of acquittal as to the tax fraud conspiracy, and by prohibiting him from admitting certain documentary evidence during the government's case-in-chief. Finding no error, we affirm Burks' conviction.

I

On October 24, 2014, a federal grand jury in the Western District of North Carolina returned an indictment charging Burks with one count each of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); mail fraud, in violation of 18 U.S.C. § 1341 (Count 2); wire fraud, in violation of 18 U.S.C. § 1343 (Count 3); and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 4). In broad terms, the indictment alleged that Burks and a number of co-conspirators had operated a Ponzi scheme through two businesses that Burks owned, Zeekler and ZeekRewards, by representing to investors, known as "affiliates," that through investing in ZeekRewards, they could share in the massive profits generated by

3

Zeekler when, in reality, Zeekler generated relatively little revenue and ZeekRewards' revenue was based almost entirely on affiliates' investments.

In addition to describing the background of Burks' scheme and the manner and means of conducting the mail and wire fraud schemes, the indictment included a number of specific allegations to support the tax fraud charge, including that Burks and co-conspirators paid themselves large sums that they diverted from the victims, including $10.1 million to Burks or his family members; used multiple bank accounts and "internet based electronic payment services ('e-wallets')," some of which were located abroad, to deposit affiliates' funds and make Ponzi payments to affiliates; failed to keep accurate and complete records of these accounts; and issued IRS Forms 1099 that reported combined affiliate income of more than $108 million for the year 2011 even though ZeekRewards actually paid affiliates less than $13 million for that year. JA 27-28. As a result of these false Forms 1099, affiliates filed false tax returns with the IRS reporting income that they had not actually received. In addition, the indictment alleged that ZeekRewards, Zeekler, and parent company Rex Venture Group LLC ("RVG") failed to file any corporate tax returns or make corporate tax payments.

Based on these background facts, the indictment alleged in Count 4 that Burks "did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the Grand Jury to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue:

4

to wit, income taxes." JA 32. In addition, Count 4 alleged two overt acts that were committed in furtherance of the conspiracy: first, that Burks and his co-conspirators "filed or caused to be filed false IRS Forms 1099 in the names of victim-investors with the IRS which reported fictional income," and second, that Burks and his co-conspirators "opened numerous bank accounts and used e-wallets, including e-wallets based in foreign countries, to receive and disburse the fraudulent payments in the scheme." *Id.*

Before trial, Burks moved to dismiss Count 4, arguing that at the end of each day, ZeekRewards would give each qualifying affiliate an "award" that the affiliate could redeem either as cash or by purchasing more VIP bids which constituted a reinvestment into ZeekRewards and that the income reported for each affiliate on his or her Form 1099 was based on the total value of that affiliate's awards for the year, not just on the awards that were paid out in cash. According to Burks, the Forms 1099 properly reflected the affiliates' income under the doctrine of "constructive receipt," which includes in a taxpayer's income not just income actually received by the taxpayer but any income that is credited to the taxpayer's account, set apart for him, or otherwise made available for him in the taxable year. Burks further argued that to the extent the appropriate application of the constructive receipt doctrine to these awards was debatable, the government could not, as a matter of law, show that Burks had willfully caused false Forms 1099 to be issued to investors and therefore could not prove that he had intended to interfere with the lawful functions of the IRS.

The district court denied Burks' motion, concluding that the indictment appropriately alleged each element of a conspiracy to defraud the United States. In

5

addition, the court explained that the parties' disputes over whether the non-cash awards qualified as income under the constructive receipt doctrine and whether Burks willfully issued false Forms 1099 were questions of fact for the jury to answer at trial.

After the district court denied Burks' motion to dismiss Count 4, the case proceeded to a three-week trial. The evidence introduced at trial established the following facts.

In 2003 Burks formed and was the sole member of Rex Venture Group LLC ("RVG"), which conducted various business ventures involving the internet sale of products and multi-level marketing ventures. J.A. 2258-63. None of these activities was very successful. During the time period at issue in this case, RVG had two divisions: Zeekler, a penny auction website, and ZeekRewards, a multi-level marketing program ostensibly developed to generate increased public interest in Zeekler's auctions.

Zeekler, which Burks founded in 2010, held online penny auctions that allowed customers to bid on desirable consumer goods like cameras and iPads. As co-conspirator Dan Olivares ("Olivares"), Zeekler's software developer and information technology specialist, explained at trial, Zeeker's auctions primarily raised revenue from the purchase of bids rather than from the price paid for the auctioned item:

> Well, it works like you buy bids. Let's say you buy them in packs of, like, 25, 50 or a hundred bids per pack and each of these bids are – cost about 60 cents per bid. Okay. And then you go to the auction and you bid on one and you spend one of those bids. Okay. But the price on the auction starts at 1 cent. So you're going to bid and every time you bid it's going to increase it by 1 cent. So it starts out at 1 cent. You spend 60 cents by clicking the bid button. And it's now 2 cents. Okay. And then when that happens, the time – there's a timer on there that's counting down and when

6

that happens it raises the time by 20 seconds. So that extra 20 seconds gives another person an opportunity to bid. Okay.

And so what happens is one person bids, it goes up to, you know, 2 cents. Another person bids, it goes up to 3 cents. Then the time drops under 20 seconds. Okay. So it's now 20, 10, and at the end of the timer it ends, like the auction ends, and whoever is the last bidder wins.

So you keep bidding and bidding and meanwhile you've spent, you know, 60 cents times however many bids you've put in, okay. And then you buy the – and then when the timer runs out, which it doesn't for a while because every time somebody bids, it increases the timer to 20, because it's under 20 and there's a limit, but that's details.

So when the auction ends, the last person who bid gets it at, I don't know, a dollar 50. But that also means that there were 150 bids at 60 cents that were spent on that auction. So if you think about it, it's kind of like everybody kind of participates in paying for the auction when they bid. And then when it's over, the final person – the final person who wins it, pays the leftover – I mean, the displayed price. So it's a little like a game and it's like – it is an auction and it's a little like a game.

JA 455-56.

Throughout 2010, Zeekler was not profitable. As a result, in January 2011, Burks created ZeekRewards, a complicated multi-tiered marketing system, in an attempt to advertise Zeekler's auctions and increase traffic to Zeekler. Although the specific aspects of the ZeekRewards system changed over time, the basic idea was that individuals, known as "affiliates," would advertise Zeekler's penny auctions in exchange for a portion of the auctions' profits. Affiliates bought into the system by paying a monthly subscription fee; purchasing a certain number of "VIP bids," which operated in Zeekler's auctions just like normal bids (which were known as "retail bids") but cost $1.00 rather than 60 cents and could be given away to third parties as samples; and placing an online ad each day to promote Zeekler. Affiliates were expected to help grow both the

7

ZeekRewards and Zeekler businesses, and they were provided with significant monetary incentives to market Zeekler and recruit new affiliates. Specifically, an affiliate received a commission on each bid that was purchased by a new affiliate that he or she recruited into the program, and affiliates who met the requirements of the program qualified to participate in a profit sharing arrangement, which involved the affiliates splitting a daily pool of money, known as the Retail Profit Pool ("RPP"). Each qualifying affiliate's share of the RPP on a given day was determined by the affiliate's VIP Point balance on that day, and affiliates earned VIP Points by buying VIP bids and selling retail bids.

To recruit affiliates, Burks represented that Zeekler was a successful business and that the affiliates shared in up to 50 percent of the auction's daily profits through the RPP. According to the materials provided to affiliates, at the end of each day, Burks would calculate Zeekler's earnings for that day and then designate a percentage of those earnings as that day's RPP.[1] To divide the RPP among qualifying affiliates, Burks would select a daily "compounder" that was applied to each affiliate's VIP Points balance to determine his or her daily award. For example, if the compounder on a given day was 1% and an affiliate had a balance of 1,000 VIP points, the affiliate would receive a $10 award at the end of the day. Each affiliate could then choose whether to receive the award in cash; to reinvest the entire award by using it to buy additional VIP bids, thereby

---

[1] The evidence at trial indicated that RVG and Burks at least sometimes represented to prospective investors that the RPP was comprised of 50 percent of Zeekler's profits each day; however, at other times, RVG and Burks represented that the RPP was comprised of up to 50 percent of the auction's daily profits, with the exact percentage determined each day by a proprietary formula.

8

increasing the affiliate's point total; or to receive a portion of the award in cash and reinvest the rest of it. The default setting on the ZeekRewards website reinvested 100% of the award, and both Burks and the ZeekRewards website encouraged affiliates to reinvest at least 80% of their daily awards.

Theoretically, the compounder should have been chosen each day such that, when applied across all qualifying affiliates' VIP Point balances, it resulted in a combined award equal to the portion of that day's profits that Burks intended to designate as the day's RPP; however, RVG did not keep track of its profits and expenses and did not maintain sufficient financial records to allow it to determine each day's earnings with any degree of accuracy. Instead, Burks usually pulled the compounder number out of thin air, often using the same compounder that had been used on the same day of the week the previous week and other times picking a compounder in advance. The compounder figure ranged from approximately 0.3 percent to 3.42 percent and averaged 1.4 percent, a number that was chosen by Burks to provide a consistent return and make the program appear stable.

By the second half of 2011 and throughout 2012, the ZeekRewards program—although not Zeekler—grew at an explosive rate. Between the middle of 2011 and August 2012, ZeekRewards' daily cash flow increased from less than $20,000 to more than $10 million. Even though ZeekRewards was ostensibly developed as a marketing division to help promote Zeekler's auctions, the explosion of interest in ZeekRewards did not translate into a similar increase in participation in Zeekler's auctions. Instead, many

affiliates purchased VIP bids but never gave them away[2], and 98 percent of all incoming funds were from the VIP bid purchases and affiliates' subscription fees, rather than from purchases of retail bids or auction activity. This structure resulted in a classic Ponzi scheme: ZeekRewards affiliates were led to believe that they were accumulating stable and large returns on their ZeekRewards investments based on the success of Zeekler's auctions but, in reality, Zeekler was unsuccessful and any returns to affiliates were based almost entirely on the revenue from affiliates investing in the ZeekRewards program.[3]

Despite the minimal revenue from the penny auctions, when affiliates brought concerns about the sustainability of ZeekRewards' business model to Burks's attention, he repeated his misrepresentations that Zeekler's success was driving the affiliates' awards. For example, when one affiliate sent a concerned email because a prospective recruit, who was a compliance analyst at a bank, told him that the "opportunity sounded very familiar to a [P]onzi scheme," Burks responded that a Ponzi scheme "is a fraudulent investment opportunity that pays returns to separate investors, not from any actual profit earned by the organization, but from their own money or money paid by subsequent

---

[2] Until August 2011, affiliates received points for each VIP bid that they purchased, even if the bid was never given to a third party or used in a Zeekler auction. In August 2011, Burks changed the model and required affiliates to give away their VIP bids; however, affiliates were allowed to give them to a "company bid pool" rather than third parties and, throughout this time, the purchase of retail bids remained flat.

[3] As Olivares explained, Burks and the other co-conspirators recognized early on that this business model was "unsustainable in general" because the awards that each affiliate was receiving were "not tied to the sale of products" and, as a result, RVG always risked running out of cash to make the affiliates' payments. JA 546.

10

investors" and that, to the contrary, the ZeekRewards "system is based entirely on actual profits earned by our online businesses." JA 2459-60. Similarly, with Burks' approval, RVG advertised the sustainability of the ZeekRewards system based on the representation that "the ratio of shoppers to affiliates is so high" when, in reality, the affiliates far outnumbered the Zeekler shoppers. JA 2511-12.

As a result of this explosive growth, ZeekRewards risked attracting the attention of regulators, and the company took a variety of steps to deflect any such attention. For example, Burks intentionally chose to use the word "compounder" rather than "interest" to describe the daily rate of return on each affiliate's VIP Points to avoid attracting the attention of the Securities and Exchange Commission. In addition, in August 2011, Burks changed the RPP system so that VIP bid points, which had previously expired when the affiliate had received a 125% return on the purchase, instead expired after 90 days. This change was designed to avoid the appearance of guaranteeing a 125% return, which Burks believed could have created the potential for SEC involvement. The company also engaged in discussions about opening a data center in the Cayman Islands because their attorneys had advised them that doing so would be the "best for legal reasons" in that the "IRS, regulators, [J]ustice [D]epartment[,] and [A]ttorney [G]eneral[] cannot get in there." JA 2098. Moreover, in early 2012, RVG issued Forms 1099 to approximately 9,000 affiliates, which helped give the company the appearance of legitimacy.

Despite these measures, various individuals and business contacts raised concerns about RVG's practices, and federal authorities began to look into the company. Specifically, a number of affiliates complained about the Forms 1099 because RVG had

included as non-employee compensation the total combined value of each affiliate's daily awards, regardless of whether the affiliate had received the awards in cash or had reinvested the award by purchasing more VIP bids. As a result, of including both cash payments and the purported value of affiliates' award points in the Forms 1099, those forms reflected compensation amounts that were much larger than the affiliates' actual cash earnings and, in aggregate, the forms reflected that the affiliates had received more than $108 million in non-employee compensation in 2011, even though less than $37 million had been deposited into RVG's bank accounts throughout the year.

In addition, officials at NewBridge Bank, where RVG had maintained an account for years, grew increasingly concerned about the growth in deposits and filed multiple suspicious activity reports with the United States Treasury. Eventually, in April or May 2012, NewBridge terminated its relationship with RVG. After failing to find another bank that was willing to handle its business, RVG set up accounts with at least three different e-wallet companies, some of which were in foreign countries. The e-wallets resulted in substantial co-mingling of funds because affiliates could both pay into the e-wallets when purchasing VIP bids and also receive their daily awards from the same e-wallet balances. This transition to the e-wallet platforms compounded the difficulties created by RVG's already-haphazard accounting practices.

Despite these problems, Burks continued to market ZeekRewards and seek new affiliates. For example, in July 2012, months after Burks first learned that the SEC was investigating ZeekRewards, RVG hosted a "Red Carpet Event," where the ZeekRewards program was promoted to 1200 guests. In the promotional materials used at the event,

Burks did not disclose the pending SEC investigation but stated that the company had "developed a compliance program" that would "keep Zeekler free from legal/government entanglements and ensure it will be running strong for years to come." JA 2531-32.

The scheme finally crumbled when, on August 17, 2012, Burks and RVG entered into a voluntary agreement with the SEC to close RVG, Zeekler, and ZeekRewards. In total, during the life of ZeekRewards, RVG's income consisted of $818 million in VIP bid purchases, $96 million in subscription payments, and only $18 million in retail bid purchases and other auction-related revenue. That is to say, even though ZeekRewards affiliates were recruited with representations that the Zeekler auction was stable and profitable and that their returns would come from those profits, the overwhelming majority of RVG's income came from affiliates' purchases, not from Zeekler's auctions. Almost 90 percent of ZeekRewards affiliates lost money through their participation in the program and their combined losses were approximately $755 million. In addition, the daily RPP award was, on average, approximately 3.5 times the daily revenue but, because the majority of affiliates chose to reinvest the vast majority of their daily awards, RVG was able to disburse substantially less cash than it received each day. Lastly, between May 2011 and April 2012, Burks paid himself more than $10 million from RVG accounts.

Burks moved for a judgment of acquittal on Count 4 at the close of the government's case and again at the close of his own case, arguing that there was not sufficient evidence for the jury to conclude that he had participated in any agreement to impede the lawful functions of the IRS. The district court denied both motions.

13

The jury found Burks guilty on all four counts, indicating on the verdict form that they found that he had committed Overt Act B, related to the opening of bank accounts and e-wallets to receive and disburse payments.

II

Burks first argues that the district court erred in refusing to dismiss Count 4 before trial and, furthermore, that this error infected the jury's verdict on the remaining counts because some prejudicial evidence was only admitted based on its relevance to the charge in Count 4.

A district judge's legal conclusions in resolving a pretrial motion to dismiss an indictment are reviewed *de novo*, and factual findings are reviewed for clear error. *United States v. Zhu*, 854 F. 3d 247, 253 (4th Cir. 2017). Federal Rule of Criminal Procedure 12(b)(3) allows a defendant to move before trial to dismiss the indictment for failure to state an offense. To overcome such a motion, the indictment must include every essential element of the offense. *See United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014). In general, it is "sufficient that an indictment set forth the offense in the words of the statute itself." *Id.* (internal quotation marks omitted). Furthermore, if the indictment meets this standard, it "is valid on its face" and the court may not "review the sufficiency of evidence supporting" the indictment because a valid "indictment returned by a legally constituted and unbiased grand jury" is "enough to call for trial of the charges on the merits." *United States v. Wills*, 346 F.3d 476, 488-89 (4th Cir. 2003).

The parties agree that Count 4 alleges what has come to be known as a *Klein* conspiracy. *See United States v. Klein*, 247 F. 2d 908, 915 (2d Cir. 1957). The elements

14

of a *Klein* conspiracy are not in dispute. They consist of (1) an agreement between two or more persons (2) with the intent to impede or obstruct the IRS in the collection of revenue and performance of its duties and (3) the performance of an overt act to further that agreement. *United States v. Vogt*, 910 F. 2d 1184, 1202-03 (4th Cir. 1990).

The indictment properly alleged each of these elements. Specifically, the indictment alleged that Burks "did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree with other individuals" to "defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes." JA 32. This portion of the indictment properly charged the first and second elements of a *Klein* conspiracy: an agreement with the intent to impede the IRS in the collection of revenue. In addition, the indictment alleged two specific overt acts that were undertaken in furtherance of this conspiracy: the issuance of false IRS Forms 1099 that misrepresented the amount of income that affiliates had received in 2011 and that the co-conspirators intended would be filed with the IRS, as well as the opening of numerous e-wallet accounts and failure to keep accurate records.

Accordingly, the indictment appropriately alleged each element of a *Klein* conspiracy[4] and the district court did not err in denying Burks' pretrial motion to dismiss Count 4.[5]

---

[4] In spite of the indictment properly alleging each element of a *Klein* conspiracy, Burks argues, based on *United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985), that the indictment should have been dismissed before trial because as a matter of law, whether to report both cashed-out and reinvested awards as income on the Forms 1099 raised a sufficiently vague question of tax law that Burks could not have acted with the required intent to defraud. Burks supported this argument with citations to Treasury regulations, case law from the United States Tax Court, and an opinion letter drafted by an experienced tax lawyer. This argument is unpersuasive.

First, as is evidenced by Burks' attempt to submit evidence that went far beyond the four corners of the indictment, his argument was not raised in the appropriate context. The resolution of such a question about the application of the tax laws to the specific facts of the case is a quintessential role of the jury. The problematic nature of Burks' argument is only highlighted by *Mallas* itself. In that case, the court determined that the appropriate application of the tax laws to the defendants' conduct was highly debatable and therefore that their convictions could not be sustained; however, this determination only occurred after a full jury trial. Therefore, *Mallas* does not indicate that it is appropriate for the district court to conduct a mini-trial to determine how clearly the tax laws apply to the facts of the case when evaluating a pretrial motion to dismiss.

Second, even on the merits, Burks' argument about the Forms 1099 is unpersuasive. In essence, Burks argues it was correct to include as income on the Forms 1099 both awards received in cash and those reinvested because the reinvested awards counted as income that the affiliates had "constructively received." Under the tax regulations, income is constructively received by a taxpayer when it is "credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." 26 C.F.R. § 1.451-2(a). The Forms 1099 that RVG issued to its affiliates indicated that the affiliates together constructively or actually received more than $108 million of income in 2011; however, RVG's revenues in 2011 were only $37 million. Based on this revenue stream, it would have been impossible to conclude that more than $108 million was "made available [to affiliates] so that [they] may draw upon it at any time" and, therefore, it was not vague or highly debatable whether the affiliates had constructively received all of the income that the Forms 1099 reported. Accordingly, even on the merits, Burks' argument is unavailing.

(Continued)

16

III

Burks next argues that the district court erred in denying his motion for acquittal on Count 4 and, specifically, that the government failed to introduce sufficient evidence to support a *Klein* conspiracy conviction because there was no evidence that the conspirators intended to impede the IRS.

The denial of a motion for acquittal is reviewed *de novo*. *United States v. White*, 810 F.3d 212, 228 (4th Cir. 2016). In deciding such motions, the "question is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The government introduced more than sufficient evidence to allow a reasonable jury to find that Burks and his co-conspirators entered into an agreement with the intent to impede the lawful functions of the IRS. For example, the government introduced

---

Third, even accepting Burks' argument about the Forms 1099, the indictment alleged a second overt act: that Burks and his co-conspirators created numerous e-wallet accounts and failed to keep appropriate records in an attempt to stymie the IRS. Therefore, the indictment appropriately alleged each element of a *Klein* conspiracy even disregarding the overt act involving the Forms 1099.

[5] Because the district court's refusal to dismiss Count 4 was proper, we need not determine whether any prejudice resulting from this decision infected the other counts; however, we observe that the district court appropriately gave limiting instructions when allowing the introduction of evidence that was only admissible as to Count 4. JA 1557. Because "we assume that juries abide by the instructions given to them," *United States v. Hager*, 721 F.3d 167, 189, even if the district court had been incorrect to deny Burks' motion to dismiss, we would not hold that this error infected the other counts of conviction.

17

evidence that Burks and his co-conspirators operated a business with nearly a billion dollars in revenue and did so without maintaining any accurate business records or ledgers; that both RVG and Burks repeatedly failed to file income tax returns; that members of the conspiracy repeatedly discussed how to structure their scheme to avoid attracting the attention of federal regulators, including specifically discussing on at least one occasion the potential opening of a data center in the Cayman Islands where the IRS could not operate; and that after the company's bank grew suspicious of the large volume of deposits and filed multiple suspicious activity reports with the United States Treasury, RVG opened a number of e-wallet accounts and comingled funds in those accounts in a way that made it difficult to determine how much money was flowing in and out of the company. Even without considering the false Forms 1099, this evidence was more than sufficient to allow the jury to find that Burks and his co-conspirators had the intent to impede the lawful functions of the IRS. *Cf. United States v. Sturman*, 951 F.2d 1466, 1473 (6th Cir. 1991) (holding that the intent element of a *Klein* conspiracy was adequately alleged where the defendant "set up a complex system of foreign and domestic organizations, transactions among the corporations, and foreign bank accounts" that "prevent[ed] the IRS from performing its auditing and assessment functions").

This conclusion is bolstered by the evidence concerning the false Forms 1099. As discussed above, Burks and his co-conspirators issued 9,000 Forms 1099 that, in aggregate, misstated the income that the affiliates had received from ZeekRewards by a staggering degree. The evidence at trial indicated that the co-conspirators' purpose in preparing these false returns was to lend an air of legitimacy, stability, and profitability to

18

their scheme, which purpose necessarily includes the intent to have the affiliates file the false Forms 1099 with the IRS and thereby impede the IRS's ability to perform its duty of appropriately determining the taxes owed by each affiliate. Therefore, although Burks and his co-conspirators may have had a multiplicity of purposes in mind when issuing the false Forms 1099, the intent to impede the IRS was much more than a "collateral effect" of the agreement but was instead "one of its purposes." *Vogt*, 910 F.2d at 1202.

Accordingly, the government introduced sufficient evidence at trial to allow a reasonable jury to conclude that Burks and his co-conspirators had the intent to impede the IRS and the district court properly denied his motion for acquittal on Count 4.

IV

Lastly, Burks argues that the district court erred by not allowing him to introduce certain documentary evidence during the government's case-in-chief under Fed. R. Evid. 106, which provides that if "a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time." During its direct examination of Olivares, the government introduced communications between Olivares and Burks in which Olivares asked for the day's compounder and Burks responded almost instantaneously. During cross-examination of Olivares, Burks attempted to introduce separate conversations between Olivares and Burks in which Burks took longer to respond. In addition, when the government introduced RVG emails showing that Burks had approved advertising language that was misleading, Burks attempted to introduce other communications in which he criticized

19

other advertisements for being misleading. With one minor exception, the district court refused to allow Burks to introduce the exhibits during cross-examination and instead required him to wait until his own case to do so.

We "review decisions to admit evidence for abuse of discretion." *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009) (internal quotation marks omitted). Under this standard, we may not substitute our "judgment for that of the district court" and may only reverse if the district "court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Id.* (internal quotation marks omitted). In this case, the district court did not abuse its discretion in refusing to admit the evidence under Rule 106, and Burks was not prejudiced by the district court's decision to force him to wait until his own case to admit the evidence in question, for three reasons.

First, Rule 106 did not apply to the evidence in question because "there was no partially introduced conversation that needed clarification or explanation." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996). The purpose of Rule 106 "is to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received." *Id.* In this case, the conversations introduced by the government were not themselves partial or misleading. Instead, they were complete conversations or email exchanges that showed Burks at least sometimes responding almost immediately to a request for the day's compounder and at least sometimes approving misleading language. Although the evidence the defense wished to introduce may have, like any defense evidence, provided a counter-balance to the government's inculpatory evidence, it would not have completed

20

it or clarified any misleading aspect of the government's evidence. Accordingly, on its face, Rule 106 did not apply to the evidence and the district court did not abuse its discretion in declining to admit it during the government's case-in-chief.

The propriety of the district court's decision is reinforced by the particular nature of the evidence that Burks wished to introduce because none of the evidence was especially exculpatory. The exhibits showing Burks' nearly immediate provision of the daily compounder were used to support the argument that Burks often drew the compounder out of thin air rather than appropriately deriving the compounder from a formula based on the day's revenue and the aggregate number of VIP Points held by affiliates. The government supported its view of the compounder as a fictitious figure with multiple types of evidence, including that Burks often told Olivares to simply use the compounder that had been used the week before and sometimes pre-selected the compounder before knowing what the day's revenue would be. The documents that Burks wished to introduce—showing that he sometimes took a few minutes before responding to Olivares' inquiries—were hardly exculpatory given all the other evidence about how the compounder was calculated. Similarly, to support the fraud-related elements, the government did not need to show that Burks always approved of misleading advertisements but only that he sometimes made or approved of materially false or misleading statements. Accordingly, the evidence that Burks sometimes criticized particular misleading advertisements was not especially relevant and the district court did not err in refusing to admit it during the government's case-in-chief.

Lastly, even if the district court's decision were erroneous, it was harmless error because defense counsel was not prevented from asking Olivares during cross-examination about whether Burks sometimes paused before responding to the compounder inquiries or occasionally criticized misleading language in advertisements. Moreover, Burks was able to introduce the evidence during his own case. In light of the avenues that Burks retained for both attacking the government's evidence and, later, introducing his own, he was not materially prejudiced by the district court's refusal to allow him to admit the evidence during the government's case-in-chief, and any error would be harmless.

V

For the foregoing reasons, we hold that the district court properly denied Burks' motions to dismiss Count 4 of the indictment, for a judgment of acquittal, and to introduce evidence under Rule 106. Therefore, the district court's judgment is

*AFFIRMED*.